UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| HNA SWEDEN HOSPITALITY MANAGEMENT AB, HNA HOTEL GROUP (HONG KONG) CO., LTD., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 1:19-cv-02452-JRS-MPB ) |
| EQUITIES FIRST HOLDINGS, LLC, | ) ) |
| Defendant. | ) |

**Order on Motion for Judgment on the Pleadings (ECF No. 121)**

Plaintiffs HNA Sweden Hospitality Management AB and HNA Hotel Group (Hong Kong) Co., Ltd. (collectively, "HNA") sued Defendant Equities First Holdings, LLC ("EFH") for breach of contract. EFH counterclaimed for breach of the implied covenant of good faith and fair dealing. HNA moves for judgment on the pleadings. (*See* ECF No. 121.)

## I.   Background

In the fall of 2017, EFH and HNA entered into the Pledge Agreement, which became effective on October 12, 2017. (Am. Compl. ¶ 8, ECF No. 95.) Under that agreement, EFH would loan funds to HNA, and HNA would in turn pledge stock in Radisson Hospitality AB as security. (*Id.* ¶ 7.) The amount of stock and the amount of the loan were set initially by the contract and then by subsequent loan agreements. (*Id.* ¶¶ 14, 15.) From October 23, 2017, to March 26, 2018, HNA transferred Radisson stock to EFH, and HNA received a loan from EFH, twelve times. (*Id.* ¶¶ 14, 16.) The

1

aggregate loan principal amount over that time period was $67,039,347. (*Id.* ¶ 17.) Following the March 26, 2018 transaction, HNA had pledged a total of 31,665,366 shares of Radisson stock as collateral. (*Id.*)

The contract was to last three years and up to five years under certain circumstances. (*Id.* ¶ 22.) But the Pledge Agreement contains the following term in Section 14.2:

> 14.2 **Acceleration of Maturity Due to Change in Collateral**. "Change in Collateral" shall mean and have occurred if substantially all of the stock or securities of the company which issued the Pledged Collateral is acquired in a cash or stock and cash transaction and the stock or security representing the Pledged Collateral ceases to be listed or traded on a national or international securities exchange or the OTC Bulletin Board Services, the National Quotation Bureau, Incorporated or a comparable service.

(Pledge Agreement § 14.2, ECF No. 95-2.) Section 14.2 goes on to establish early-termination procedures, how much HNA owes to EFH if a "Change in Collateral" event occurs, and how much EFH owes to HNA if a "Change in Collateral" event occurs. (*Id.*)

Before it entered into the Pledge Agreement, HNA held almost 70 percent of the outstanding shares in Radisson. (Counterclaim ¶ 41, ECF No. 103.) After taking twelve loans from EFH, HNA held about 51 percent of the Radisson shares, having pledged 18.5 percent to EFH as collateral under the Pledge Agreement. (*Id.*) On August 9, 2018, HNA agreed to sell the 51 percent stake in Radisson it still held to an international consortium led by Jin Jiang International Holdings Co., Ltd. ("Jin Jiang"). (*Id.*) On February 5, 2019, an acquisition vehicle called Aplite Holdings, AB announced that the Jin Jiang-led consortium had amassed 164,143,028 shares of

Radisson stock—94.12 percent of the shares and votes. (Am. Comp. ¶ 34, ECF No. 95.) The consortium indicated it would privatize Radisson. (Counterclaim ¶ 53, ECF No. 103.) The Radisson stock's last day of trading on Stockholm Nasdaq was March 22, 2019. (*Id.* ¶ 36.) Thereafter, the Radisson stock was delisted. (*Id.* ¶ 37.)

On May 13, 2019, HNA claimed that a "Change in Collateral" event had occurred on March 22, 2019, and it demanded $70,137,143.51 from EFH pursuant to Section 14.2 of the Pledge Agreement. (Id. ¶¶ 42, 44.) EFH never remitted that or any other sum to HNA. (*Id.* ¶ 43.) Rather, EFH contested whether a "Change in Collateral" event had happened and notified HNA that it believed HNA was in default of the agreement, obviating any need for EFH to further perform. (*Id.* ¶ 54; Counterclaim ¶ 56, ECF No. 103.)

On June 17, 2019, HNA filed suit against EFH for breach of contract. EFH counterclaimed for breach of the implied covenant of good faith and fair dealing. HNA now moves for judgment on the pleadings. (*See* ECF No. 121.)

Additional allegations will be discussed below as necessary.

## II.    Standard of Review

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Judgment on the pleadings is appropriate only if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See Unite Here Local 1 v. Hyatt Corp.*, 862 F.3d 588, 595 (7th Cir. 2017). "The only difference between a motion for judgment on the pleadings and a motion to dismiss is timing; the standard is the

3

same." *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 313 (7th Cir. 2020). Thus, to survive a motion for judgment on the pleadings, the nonmovant's claim as pleaded must be facially plausible. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing the motion, the Court is "confined to the matters presented in the pleadings" and "must consider those pleadings in the light most favorable to" the nonmovant. *Unite Here*, 862 F.3d at 595.

### III. Discussion

The Court has jurisdiction under 28 U.S.C. § 1332. (*See* ECF No. 153.) When a federal court exercises diversity jurisdiction, the choice-of-law rules of the forum state apply. *See Native Am. Arts, Inc. v. Hartford Cas. Ins. Co.*, 435 F.3d 729, 731 (7th Cir. 2006). Indiana law clearly favors contractual choice-of-law provisions and presumes they are valid. *See Dexter Axle Co. v. Baan USA, Inc.*, 833 N.E.2d 43, 49 (Ind. App. 2005). Accordingly, with the parties in agreement, the Court will apply New York law pursuant to the choice-of-law provision in the Pledge Agreement. (Pledge Agreement § 14.3, ECF No. 95-2.)

*A. Breach of Contract*

Under New York law, the elements of a breach-of-contract claim are "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Markov v. Katt*, 109 N.Y.S.3d 295, 296 (N.Y. App. Div. 2019). No one disputes the existence of a contract. However, the briefs battle over whether HNA has performed under the Pledge Agreement. Namely, EFH contends that HNA

4

breached its obligation of good faith and fair dealing by conspiring with the Chinese government and Jin Jiang to sell HNA's Radisson shares to Jin Jiang at an inflated price and to EFH's detriment.

New York law reads into every contract an implied covenant of good faith and fair dealing, "pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . ." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990). Courts should enforce the implied covenant "where an implied promise was so interwoven in the whole writing of a contract as to be necessary for effectuation of the purposes of the contract." *Id.* (cleaned up).

It is important to understand what the implied covenant *cannot* do. It cannot be used to create duties that would be "inconsistent with other terms of the contractual relationship." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291–92 (N.Y. 1995) (citing *Murphy v. Am. Home Prod. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983)). Nor can the implied covenant "extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *Galesi*, 904 F.2d at 136 (citation omitted). Where an alleged breach of the implied covenant is grounded in the defendant's exercise of a right expressly contemplated in the contract, the allegations must "support a claim that [the defendant] exercised a right malevolently, for its own gain as part of a purposeful scheme designed to deprive [the plaintiff] of the benefits of the" bargain. *Richbell*

5

*Info. Servs., Inc. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 587 (N.Y. App. Div. 2003).

The following facts are alleged in support of the counterclaim. First, by 2017, HNA was overleveraged after borrowing billions of dollars from Chinese state-owned banks and engaging in a "global acquisition spree." (Counterclaim ¶¶ 16, 17, ECF No. 103; ECF No. 103 at 13.) Chinese state-owned banks and Chinese regulators began pressuring HNA to decrease its debt and increase its liquidity. (Counterclaim ¶ 18, ECF No. 103.) In or around June 2017, HNA sought to enter a financing transaction with EFH using various shares in the hotel industry as collateral. (*Id.* ¶ 19.) Though the 2017 transaction fell through, HNA learned that EFH's business model revolved around the ability to trade the shares pledged as collateral during the term of the loan. (*Id.* ¶ 24.) "[A]s early as June 2018," the Chinese government began pressuring HNA specifically to divest itself of its position in Radisson. (*Id.* ¶ 40.) And that pressure led to HNA's sale of 51 percent of the Radisson shares to Jin Jiang at 35 Swedish Krona per share. (*Id.* ¶ 41.) Thereafter, the Chinese government "coordinated" a tender offer for the remaining outstanding shares in the market and, in collaboration with Jin Jiang and HNA, drove up the Radisson share price to an "inflated level" of 40 Swedish Krona per share. (*Id.* ¶ 50.) EFH—having sold the pledged 18.5 percent of the Radisson shares sometime before the tender offer, (ECF No. 136 at 5–6; Am. Compl. ¶ 53, ECF No. 95)—was left in the tough position of needing to reimburse HNA for the value of the Radisson shares at the "inflated" price,

6

if EFH were to treat the Radisson privatization as a bona fide change-in-collateral event under the contract.

EFH acknowledges that it has been somewhat vague about the precise conduct it believes constituted a breach of the implied covenant. (*See* ECF No. 130 at 10 n.5 (stating that it is "impossible to resolve (or even know) the exact facts" underlying its counterclaim at the pleading stage).) If EFH's theory is (1) that a heavily indebted HNA faced pressure from the Chinese government to deleverage, (2) that partway through the course of the Pledge Agreement, HNA decided to sell its Radisson position to increase liquidity, and (3) that EFH was incidentally harmed by the sale and its consequences, then there was no breach of the implied covenant of good faith and fair dealing. In this scenario, HNA would have maneuvered within its "general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *Galesi*, 904 F.2d at 136. The parties clearly contemplated that HNA had a right to sell its Radisson stake—otherwise, the entire "Change in Collateral" portion of the Pledge Agreement would be nugatory. (*See* Pledge Agreement § 14.2, ECF No. 95-2 at 17.) And the Court is inclined to agree with HNA that sequential stock acquisitions—like the ones the Jin Jiang consortium orchestrated—can trigger the "Change in Collateral" event. To state a claim for breach of the implied covenant with respect to a counterparty's exercise of an *expressly contemplated* contractual right, EFH would need to allege that HNA exercised this right to sell its remaining Radisson shares "malevolently, for its own gain as part of a purposeful scheme designed to deprive [EFH] of the benefits of the"

7

bargain. *Richbell*, 765 N.Y.S.2d at 587 (plaintiffs stated claim for breach of implied covenant of good faith and fair dealing where defendants allegedly exercised their contractual veto power in bad faith as part of a "secret agreement" solely for personal gain and to deprive the plaintiffs of the benefits of the joint venture).

EFH *does* claim that "HNA conspired with the Chinese government and a state-owned entity, Jin Jiang, to bail out an overleveraged HNA at EFH's expense." (ECF No. 130 at 8.) This appears to fit the "purposeful scheme" scenario discussed in *Richbell*. And, although the theory perhaps could have been stated more clearly without resort to buzzwords like "conspiracy," it is at least minimally supported by the allegations and reasonable inferences arising from them. Given HNA's knowledge of EFH's business model, (Counterclaim ¶ 24, ECF No. 103), one could infer that HNA sold its Radisson holdings with the intent or knowledge that EFH would partially foot the bill for an eventual bailout-by-privatization.[1] EFH also alleges that HNA, Jin Jiang, and the Chinese government were not transacting at arms-length, (*id.* ¶¶ 18, 44, 50, 54), and several news articles tend to support that allegation, (*see* ECF No. 136-1 (HNA "effectively taken over" by Hainan provincial government in 2020); ECF No. 136-2 (Chinese government officials asked HNA to sell

---

[1] Other facts tend to cut against such a finding of malevolent purpose. For example, HNA apparently became aware that EFH no longer owned the pledged shares many months *after* HNA sold its 51 percent Radisson stake to the Jin Jiang-led consortium. (*See* Am. Compl. ¶ 53, ECF No. 95.) The Court cannot see how HNA could have schemed to make EFH partially pay for its bailout if HNA did not yet know whether EFH still held the pledged shares—had EFH retained the shares, the Chinese government and the consortium seemingly would have borne the entire cost of "inflating" the Radisson share price via the tender offer. Nevertheless, the Court is mindful that it must view the pleadings in the light most favorable to EFH at this stage. *See Unite Here*, 862 F.3d at 595.

unspecified assets to lower debt)). According to EFH, HNA, Jin Jiang, and the Chinese government coordinated the Radisson sale, tender offer, and squeeze-out to "grossly inflate" the share price before privatization, culminating in a $70 million windfall to HNA under the Pledge Agreement's terms, at EFH's expense. (ECF No. 103 at 14.) All this, EFH says, constituted a "purposeful scheme" by HNA to deprive EFH of the benefits of the contract. (Counterclaim ¶ 63, ECF No. 103.)

HNA attacks these allegations as inadequate in part because many are brought "on information and belief." But the counterclaim is not for something like fraud, which would trigger a heightened pleading standard under Rule 9(b). The counterclaim is for breach of the implied covenant, which is governed by the normal pleading standard of Rule 8(a). And, "under Rule 8(a), a party alleging matters peculiarly within another party's knowledge may plead those matters on 'information and belief.'" *FirstMerit Bank, N.A. v. Ferrari*, 71 F. Supp. 3d 751, 757 (N.D. Ill. 2014) (citation omitted). Since a purposeful and malevolent scheme to deprive EFH of the benefits of the bargain would be peculiarly within HNA's knowledge, the Court does not find EFH's "information and belief" allegations improper.

EFH's theory may sound farfetched to HNA given what HNA knows. But, taking all allegations as true at this stage, the Court cannot say that EFH's theory is wholly implausible. Thus, EFH has said enough to state a claim for breach of the implied covenant of good faith and fair dealing. There remains a material factual dispute as to whether HNA has performed, so HNA is not entitled to judgment on the pleadings as to its breach-of-contract claim.

*B. Counterclaim*

The reasoning above also sustains EFH's counterclaim for breach of the implied covenant of good faith and fair dealing. However, the Court must address HNA's alternative argument that the counterclaim is barred by a release. Specifically, on April 2, 2019, EFH sent HNA twelve "notices" (one for the initial borrowing and eleven for the subsequent eleven tranches of collateral) containing the following language:

> As of April 2, 2019, the [Pledge] Agreement and all obligations of both parties have terminated and you have forfeited all remaining rights in the Pledged Collateral under the [Pledge] Agreement. And, as a result, EFH releases and discharges you as the Borrower from any claims under or in connection with the [Pledge] Agreement, and EFH has recourse only to the Pledged Collateral.

(ECF No. 95-7; *see also* Am. Compl. ¶ 54, ECF No. 95.) HNA says these notices were a release of liability.

"[A] general release is governed by principles of contract law." *Gyabaah v. Rivlab Transp. Corp.*, 958 N.Y.S.2d 109, 110 (N.Y. App. Div. 2013). A contract is formed only if there is a mutual intent to be bound—that is, offer and acceptance. *E.g., Keis Distribs. Inc. v. N. Distrib. Co.*, 641 N.Y.S.2d 417, 419 (N.Y. App. Div. 1996). "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." RESTATEMENT (SECOND) OF CONTRACTS § 24 (1981). Likewise, an acceptance is a "manifestation of assent to the terms . . . made by the offeree . . . ." *Id.* § 50.

10

Though the twelve "notices" are not phrased as questions, offers need not be phrased as questions if they otherwise manifest "willingness to enter into a bargain." *Id.* § 24. The letters are best understood as offers. (*See* ECF No. 95-7 (stating EFH's understanding that HNA forfeited any remaining rights under the Agreement and, "as a result," releasing HNA from claims related to the Agreement).) EFH was stating its belief that the delisting of the Radisson stock triggered events of default under the Pledge Agreement, terminating any further obligations of either party. (*See* ECF No. 95-7 at 3 ("This [notice] is only intended as an abbreviated explanatory summary of the salient contract terms and does not modify or supersede the Agreement in any way.").) There is no allegation that HNA accepted EFH's release offer. The fact that the parties are in court now is itself proof that HNA disagreed that all obligations under the contract had ended. Without an acceptance, no contract for release formed. It follows that no release bars EFH's counterclaim.

## IV.   Conclusion

There is at least one continuing factual dispute as to whether HNA acted in a way that breached the implied covenant of good faith and fair dealing. Judgment on the pleadings is therefore inappropriate, and the motion, (ECF No. 121), is **denied**.

**SO ORDERED**.

Date: 5/12/2021

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Robert Belden
WILLIAMS & CONNOLLY, LLP
rbelden@wc.com

Jackie M. Bennett, Jr.
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
jbennett@taftlaw.com

Jayna Morse Cacioppo
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
jcacioppo@taftlaw.com

Thomas Cull
WHITE & CASE LLP
thomas.cull@whitecase.com

Matthew Devine
WHITE & CASE LLP
matthew.devine@whitecase.com

Andrew K. Gershenfeld
WHITE & CASE LLP
andrew.gershenfeld@whitecase.com

Carolyn Pelling Gurland
WHITE & CASE LLP
carolyn.gurland@whitecase.com

Simon Latcovich
WILLIAMS & CONOLLY, LLP
slatcovich@wc.com

Barry S. Simon
WILLIAMS & CONNOLLY, LLP
bsimon@wc.com

Richard A. Smikle
ICE MILLER LLP (Indianapolis)
richard.smikle@icemiller.com